Filed 1/31/14  Spinosi v. Quality Loan Service Corp. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JOEL SPINOSI et al., | |
| Plaintiffs and Appellants, | G047664 |
| v. | (Super. Ct. No. 30-2012-00586502) |
| QUALITY LOAN SERVICE CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Orange County, William M. Monroe, Judge.  Affirmed.

Law Office of Lenore Albert and Lenore L. Albert for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton, Eric J. Troutman, Andrew A. Wood and Kerry W. Franich for Defendants and Respondents.

\*          \*          \*

Plaintiffs Joel and Rose Spinosi appeal from the court's November 15, 2012 order denying their application for a preliminary injunction to enjoin the foreclosure sale of their home.[1] The trial court concluded plaintiffs were unlikely to prevail on the merits. We agree. Accordingly, we affirm the order.

## FACTS[2]

In April 2007, Joel borrowed $930,000 from SCME Mortgage Bankers, Inc. (SCME), secured by a deed of trust executed by both plaintiffs on their home in Coto

---

[1] Plaintiffs also purport to appeal from the court's $1,500 sanctions order imposed on their attorney. But the sanctions order is not appealable at this time. (Code Civ. Proc., § 904.1, subd. (b) [sanctions order of $5,000 or less is appealable only after final judgment or by petition for extraordinary writ].)

[2] Under Code of Civil Procedure section 527, subdivision (a), a trial court may grant a preliminary injunction based on sufficient grounds shown in either a *verified* complaint or affidavits. The record contains no affidavit of a party verifying either the complaint or first amended complaint. We therefore take no facts supporting plaintiffs' injunction application from the allegations of those documents. Furthermore, most of the record references in plaintiffs' opening brief (they did not file a reply brief) are to documents which were not before Judge Monroe on November 12, 2012, when he ruled on plaintiffs' injunction application.

We grant defendants' request that we take judicial notice of certain documents related to Joel's bankruptcy case.

We deny plaintiffs' request for judicial notice of the Federal National Mortgage Association's (Fannie Mae) Announcement 09-05R since it is irrelevant to the court's ruling on their preliminary injunction application. The record reflects they did not qualify for the Home Affordable Modification Program. (See *West v. JP Morgan Chase Bank*, *N.A.* (2013) 214 Cal.App.4th 780, 785 [U.S. Dept. of the Treasury implemented the Home Affordable Modification Program to "help homeowners avoid foreclosure during the housing market crises of 2008"].) The record does not show that the Special Forbearance/Workout Agreement between the parties was entered into pursuant to FannieMae's HomeSaver Forbearance program.

To avoid confusion and for ease of reference, we refer to the plaintiffs singularly by their first names. We mean no disrespect.

2

De Caza. In a February 2, 2010 letter, defendant Aurora Loan Services, LLC (Aurora) advised Joel that it had tried unsuccessfully to contact him at least three times and asked him to contact Aurora about the then-owing arrearage of over $11,900 on the loan and to discuss with Aurora bringing the loan current before foreclosure became necessary.

In March 2010, Joel signed a Special Forbearance/Workout Agreement (the Forbearance Agreement), which required him to make six monthly payments between March and August of 2010. The Forbearance Agreement stated, inter alia: "The aggregate Plan payment will be insufficient to pay the Arrearage. At the Expiration Date, a portion of the Arrearage will still be outstanding. Because payment of the Plan payments will not cure the Arrearage, Customer's account will remain delinquent. Upon the Expiration Date, Customer must cure the Arrearage through a full reinstatement, payment in full, loan modification agreement or other loan workout option that Lender may offer (individually and collectively, a 'Cure Method.') Customer's failure to enter into a Cure Method will result in the loan being disqualified from any future Lender Loss Mitigation program with respect to the loan evidenced by the Note, and regular collection activity will continue, including . . . commencement or resumption of the foreclosure process . . . ." The Forbearance Agreement expired on August 15, 2010.

On September 20, 2010, Aurora advised Joel in writing that he was $11,826 in default and could cure the default by paying that sum by October 20, 2010.

Meanwhile, in June 2010, Joel had submitted incomplete documentation to Aurora seeking a loan modification. In October 2010, Joel submitted additional documents. In November 2010, Aurora advised Joel that plaintiffs' monthly housing-to-income ratio was too high and they did not qualify for a modification. In February 2011, defendants recorded a notice of default and election to sell under the deed of trust. In April 2011 Joel submitted a new application for a loan modification. In May of 2011 Joel submitted additional documents.

3

In June 2011, plaintiffs filed their first lawsuit against defendants.

In July 2011, Aurora offered plaintiffs a traditional loan modification because their loan balance was too high to qualify for the federal Home Affordable Modification Program. Plaintiffs did not accept the offer.

In January 2012, Judge William M. Monroe sustained defendants' demurrer to plaintiffs' complaint — without leave to amend as to five causes of action and with leave to amend as to four causes of action. Judge Monroe also denied without prejudice plaintiffs' application for a preliminary injunction, ruling that plaintiffs had failed to establish a probability of success on any cause of action which would effectively stop any foreclosure. Plaintiffs voluntarily dismissed their complaint.

The trustee's sale was scheduled for July 30, 2012.

On July 26, 2012, plaintiffs filed a second lawsuit against defendants. Plaintiffs simultaneously filed an ex parte application for a temporary restraining order and an order to show cause to preliminarily enjoin the trustee's sale. Plaintiffs asserted, inter alia, (1) they had reached an agreement with their loan servicer that they could cure the default by paying $16,786; (2) they wire transferred $16,786 to their servicer as instructed; and (3) the servicer failed to rescind the default even though it was cured. Plaintiffs supported their application with their counsel's declaration that an assignment of the deed of trust had been notarized by a robo- or surrogate signer.

Judge Jamoa A. Moberly granted plaintiffs a temporary restraining order and scheduled an order to show cause hearing for a preliminary injunction. Defendants peremptorily challenged Judge Moberly. The case was reassigned to Judge David T. McEachen.

Defendants filed an opposition to plaintiffs' injunction application, supported by the declaration of Aurora's vice-president, who declared, inter alia, there are "no records in the payment history reflecting any payment by Spinosi in the sum of $16,786.27." The declaration also set forth the history of Aurora's transactions and

4

communications with plaintiffs based on her review of Aurora's "servicing records, payment records and loan origination file."

On September 12, 2012, plaintiffs filed a first amended complaint captioned as a class action, thereby superseding the operative complaint on which the temporary restraining order had issued. On September 25, 2012, Judge McEachen transferred the case to Judge Monroe. Judge McEachen stated that California Rules of Court, rule 3.300 (concerning related cases) is meant to prevent judge shopping, although Judge McEachen stated, "I'm not saying that that was [plaintiffs'] intent."

The hearing on plaintiffs' application for a preliminary injunction finally was held on November 15, 2012. Defendants' demurrer to the first amended complaint was also heard on that date. Plaintiffs and their counsel did not appear nor did they contact the court or defense counsel. Judge Monroe observed that plaintiffs' allegation they tendered $16,786 "to wipe out the entire arrears appears to have been a total fabrication, included for the sole purpose of securing" a temporary restraining order.[3] In a lengthy ruling, Judge Monroe (1) found that plaintiffs had engaged in illegal judge shopping and had hidden the illegal judge shopping by failing to file a notice of related cases and failing to advise Judge Moberly the new case was largely identical to plaintiffs' prior lawsuit; (2) sustained defendants' demurrer to the first amended complaint, with leave to amend two causes of action; (3) denied plaintiffs' preliminary injunction motion and dissolved the temporary restraining order; and (4) scheduled an order to show cause requiring plaintiffs' counsel to personally appear concerning monetary sanctions for illegal judge shopping and misleading a judge with false statements "regarding the alleged $16,786.27 payoff and plaintiffs' bankruptcy filing/stay."

---

[3]    The court's November 15, 2012 order states that no declaration supports the assertion of a $16,786 wire transfer, nor is this "crucial fact" referenced in the pleadings and that the pleadings in fact "suggest the opposite."

5

DISCUSSION

*The Court Did Not Abuse Its Discretion by Denying Plaintiffs' Injunction Application*

Our review of the court's order is limited to considering "whether the trial court abused its discretion in '"evaluat[ing] two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued."'" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109.) "'Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court.'" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.) "We do not interfere absent a clear showing the trial court's discretion has been abused." (*Husain v. McDonald's Corp.* (2012) 205 Cal.App.4th 860, 867.)

"'Discretion is abused when a court exceeds the bounds of reason or contravenes *uncontradicted* evidence.'" (*Husain v. McDonald's Corp.*, *supra*, 205 Cal.App.4th at p. 867.) "'*Where the evidence is conflicting, we do not reweigh it . . . .*'" (*Ibid.*) "'"[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts."' [Citation.] Thus, even when presented by declaration, 'if the evidence on the application is in conflict, we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.'" (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450.)

Plaintiffs bear the burden to "make a clear showing of an abuse of discretion." (*IT Corp. v. Country of Imperial* (1983) 35 Cal.3d 63, 69.) They have failed to do so, having provided us with inadequate record references, legal argument, and citation to authority. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522.) As noted in

6

footnote 2, most of plaintiffs' record references are to documents which were not before Judge Monroe at the time he denied their injunction application. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [when reviewing correctness of trial court's judgment, appellate court considers "only matters which were part of the record at the time the judgment was entered"].) Plaintiffs' brief relies largely on federal case law and standards, and also raises theories of liability, such as negligence and Civil Code section 2924.12, which were not captioned causes of action alleged in their complaint or first amended complaint (nor have plaintiffs cited their complaint and/or first amended complaint as encompassing those theories).

Even if we consider on the merits plaintiffs' contentions in their injunction application, we find no error. A moving party must support an injunction application with a verified complaint and/or affidavits. (Code Civ. Proc., § 527, subd. (a).) The record contains no verified pleading, but does include plaintiffs' counsel's declaration (Albert's declaration) supporting their injunction application.

Plaintiffs' injunction application alleged they had wire transferred $16,786 to their loan servicer to cure the loan default pursuant to an agreement with the servicer, but the servicer failed to rescind the default. But there is no evidence of such a payment in Albert's declaration or the supporting exhibits. Indeed, Judge Monroe found untrue the plaintiffs' allegation they made a $16,786 payment.

A second contention in plaintiffs' injunction application was that plaintiffs' payments under the Forbearance Agreement cured the loan default by mutual agreement of the parties. There is no evidence of this in Albert's declaration or its supporting exhibits. Moreover, the Forbearance Agreement specified that payments thereunder would *not* cure the arrearage and that the loan account would remain delinquent after the Forbearance Agreement expired.

7

Finally, plaintiffs' injunction application argued that SCME's assignment of the deed of trust to Aurora was invalid because it was allegedly robo-signed in the names of Jan Walsh and notary Irene Guerrero. Plaintiffs contended they were harmed by the allegedly invalid assignment because it allowed Aurora fraudulently to foreclose on their home. Plaintiffs alleged Walsh was an employee of defendants Aurora and Quality Loan Service Corporation. But the deed of trust assignment (attached as an exhibit to Albert's declaration) is executed by Walsh, as vice president of *SCME*. There is no evidence concerning Walsh in Albert's declaration or its supporting exhibits.

Although Albert's declaration does not mention Walsh, it does discuss Guerrero, who notarized Walsh's signature on the assignment. Albert's declaration states she had Guerrero's signature analyzed by an expert forensic document examiner on two prior occasions "wherein it is conclusive" that Guerrero's signature on the Nebraska acknowledgment of the assignment was robo- or surrogate-signed. In support, Albert attached as an exhibit the report of a forensic document examiner opining that certain handwriting features in three questioned signatures of Guerrero indicated that someone else probably prepared the signatures; however, the examiner stated his opinion was "due to the limited amount of comparable exemplars submitted for IRENE GUERRERO."

Also attached as an exhibit to Albert's declaration was a press release of the Nevada Attorney General announcing an indictment of two title officers, Gary Trafford and Gerri Sheppard, for a robo-signing scheme in Clark County, Nevada between 2005 and 2008. Albert's declaration refers to the indictment of "Gary Trafford of QLS," apparently asserting Trafford was an employee of defendant Quality Loan Service Corporation. This is the only hint we have as to the identity of Trafford and his alleged relevance to this case.

Albert also purported to attach copies of Civil Code sections 2924 and 2923.5 (for the proposition that "everything the plaintiffs are complaining about such as servicer forced defaults, dual tracking and robo-signing will now be expressly illegal on January 1, 2013").  The record reflects however, that Albert did *not* attach copies of those statutes.  Furthermore, the court's November 15, 2012 order observed that robo-signing was not yet illegal in California.

The court further found that plaintiffs failed to show they suffered any harm from robo-signing if it did occur, since plaintiffs "readily admit that they have made no payments on their house since mid-2010, with no plans to make up the deficiency, and as such have no right to keep the home."  As defendants point out, the "assignment merely substituted one creditor for another without altering [plaintiffs'] rights or obligations under their loan agreement."  Moreover, defects in notarization of an assignment of a deed of trust do not affect its validity as between the parties to it.  (*Herrera v. Federal National Mortgage Assn.* (2012) 205 Cal.App.4th 1495, 1510 ["Nothing in the comprehensive statutory scheme governing nonjudicial foreclosures ([Civ. Code,] §§ 2924 through 2924*l* ) contains a requirement that [an] assignment of [a deed of trust] must be acknowledged and recorded before [a] foreclosure sale"].)

It was within the trial court's province to judge the credibility and relevance of Albert's declaration and the supporting exhibits and to weigh them accordingly.[4]  (*Whyte v. Schlage Lock Co.*, *supra*, 101 Cal.App.4th at p. 1450.)  The court did not abuse its discretion by finding plaintiffs were unlikely to prevail on the merits.

---

[4] Defendants correctly note the sparse evidence of robo-signing was inadmissible hearsay, as was much of the material in the Albert declaration.

9

DISPOSITION

The court's order is affirmed.  Defendants shall recover their costs on appeal.

IKOLA, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.